**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 10-2040

FRANKLIN C. BROWN; KAREN S. BROWN,

                    Plaintiffs - Appellants,

          v.

NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.; ISAAC M.
NEUBERGER, Esquire; MICHAEL L. QUINN, Esquire; MARTIN L.
GRASS,

                    Defendants - Appellees.


Appeal from the United States District Court for the District of
Maryland, at Baltimore.  Catherine C. Blake, District Judge.
(1:09-cv-01684-CCB)


Argued:  September 20, 2012          Decided:  October 18, 2012


Before SHEDD and DUNCAN, Circuit Judges, and Timothy M. CAIN,
United States District Judge for the District of South Carolina,
sitting by designation.


Affirmed by unpublished opinion.  Judge Duncan wrote the
opinion, in which Judge Shedd and Judge Cain joined.


**ARGUED:** Ray M. Shepard, SMITH, GILDEA & SCHMIDT, LLC, Towson,
Maryland, for Appellants.  James Patrick Ulwick, KRAMON &
GRAHAM, PA, Baltimore, Maryland; Sara Elizabeth Kropf, BAKER
BOTTS, LLP, Washington, D.C., for Appellees.  **ON BRIEF:** Susan M.
Euteneuer, DUANE MORRIS LLP, Baltimore, Maryland; George A.

Reihner, WRIGHT AND REIHNER PC, Scranton, Pennsylvania, for Appellants.

———————————

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

This appeal arises out of the district court's grant of summary judgment in favor of Appellees Isaac Neuberger and Michael Quinn, their law firm, Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. ("NQGRG"), and Martin Grass, in an action against them by Franklin Brown and his wife, Karen Brown (collectively, the "Browns"). The Browns allege fraud and breach of fiduciary duties, and seek as damages their defense costs from a prior lawsuit, in which the Browns and Appellees were sued by Rite Aid, the mutual employer of Franklin Brown and Martin Grass. The primary question before us is one of timing: whether the Browns' claims, based on events that occurred in 2005 and before, are barred by the applicable statute of limitations. Because the district court was correct in finding that the Browns' failure to exercise due diligence after being on inquiry notice of their claims renders their tolling theories inapplicable as a matter of law, we affirm.

I.

A.

This case has its origin in a fraudulent scheme perpetrated by various officers of Rite Aid against the corporation, and Rite Aid's resulting lawsuit. In the present action, the Browns claim they did not participate in or know about the scheme and

3

assert Rite Aid only sued them because they were wrongfully implicated by Appellees.

A brief description of the roles and interrelationships of the individuals involved provides helpful context. Alex Grass founded Rite Aid in 1962, and served as CEO until 1995, when he was succeeded by his son, Martin Grass. Franklin Brown is a longtime friend of Alex Grass, and served as both his personal attorney and as general counsel of Rite Aid until 2000. Isaac Neuberger was a personal friend of the Grasses and the Browns, and he and his associates at NQGRG operated in various capacities for the Grasses. For example, NQGRG helped Alex Grass form A.G. Capital, Inc. ("A.G. Capital") as a holding company for the purpose of purchasing stock from Rite Aid, which was integral to the fraudulent scheme explained below. Neuberger was also the attorney for the 1994 Alexander Grass Descendants' Trust (the "Grass Trust"), established for the benefit of Alex Grass's issue. In 2001, Karen Brown accepted Martin Grass's request to become a trustee of the Grass Trust. Rite Aid believed all of these players were part of a scheme in which valuable securities were stolen from the corporation.

The fraudsters' scheme divested Rite Aid of two investment securities worth approximately $30 million without its knowledge. They accomplished this by bundling the securities, through forged documentation, with Rite Aid's legitimate sale of

4

Sera-Tec Biologicals, Inc. ("Sera-Tec") to Alex Grass.[1] Specifically, the fraudsters' scheme relied on the creation of two sets of disclosure documents for the Sera-Tec sale. One was a legitimate set listing only the Sera-Tec stock, on which Franklin Brown's signature appears. This set was sent out to potential investors and ultimately incorporated into the Stock Purchase Agreement ("SPA"). The second (forged) set included the investment securities, and was created in part by "lifting" Franklin Brown's signature from the original document.

As Alex Grass's personal attorney, Franklin Brown was considered an "insider" as soon as Alex Grass announced his interest in bidding on Sera-Tec, and was properly excluded from many meetings regarding the sale.[2] On October 7, 1994, the closing of the Sera-Tec deal was held at NQGRG's offices in Baltimore, Maryland. At Martin Grass's request, Franklin Brown did not attend.

Later, after Martin Grass succeeded his father as Chairman of the Board and CEO of Rite Aid on March 5, 1995, the fraudsters managed to transfer the investment securities in a

---

[1] Technically, the sale was not to Alex Grass but to his holding company, A.G. Capital, which the Browns allege was owned in significant part by the Grass Trust.

[2] During that time, Franklin Brown also served as an officer and director of Sera-Tec, in addition to being Rite Aid's counsel.

manner that made it appear to have been done as part of the October 1994 Sera-Tec closing. By forging time stamps and delivery certificates, the fraudsters made the SPA look as if it contained the forged disclosure documents, which had been stored in a "Secret File" at Rite Aid. The stolen securities then made their way through a series of shell companies before being sold by Martin Grass for $50 million. Those funds came to rest in the Grass Trust.

B.

Although the Browns assert they were ignorant of the scheme to defraud Rite Aid, even the facts as recounted by the Browns reveal at least a gradual awareness.[3] As trustee, Karen Brown received a Grass Trust balance sheet in April 2001 reflecting a balance of approximately $40 million, most of which seemingly had come from nowhere. She claims she initially "accepted the balance as accurate and legitimate" because she was a new co-trustee, but later she became suspicious and began to inquire into the source of the funds, including by consulting Jack Bernstein, an attorney who is married to her cousin. J.A. 690. Bernstein advised her to ask Neuberger for an accounting, which

---

[3] Because we review the district court's ruling on Appellees' motion for summary judgment, we view all facts in the light most favorable to the Browns. See Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

6

she did.  But she never received an accounting, and in May 2004 she was asked by Neuberger to resign as co-trustee.

By this time, the Browns had become "very suspicious that the Investment Securities had been embezzled by Defendants [NQGRG, Neuberger, Quinn, and Martin Grass] in the Sera-Tec/A.G. Capital transaction."  J.A. 679.  In 2004, Franklin Brown alerted both the government and Rite Aid's new general counsel, William Slaughter, to his theory that Rite Aid had been defrauded.  In a proffer session following his 2003 criminal conviction on different fraud charges, Franklin Brown revealed his suspicions and was confronted by the government's copy of the counterfeit Sera-Tec disclosure documents.  Apparently Franklin Brown did not recognize the significance of those documents, which bore his signature, at the time.  The proffer session was unsuccessful, because the government remained unconvinced that Franklin Brown had not himself been involved in the Sera-Tec scheme, and no assistance credit was given.  The Browns assert they remained unaware throughout these events that they might be implicated in the theft of the investment securities by Appellees.

On September 12, 2005, Rite Aid filed fraud, theft, and related claims in Pennsylvania state court against Alex and Martin Grass, A.G. Capital, Franklin Brown, and Karen Brown as Trustee of the Grass Trust, among others.  The complaint

7

described the fraudulent scheme in detail. Specifically, Rite Aid alleged that the defendants had secretly caused the investment securities to be transferred as part of the legitimate Sera-Tec sale by doctoring a separate disclosure schedule in which the investment securities were included, affixed with Franklin Brown's signature, which was "maintained exclusively in Franklin Brown's personal files" (the Secret File) and backdated with altered time stamps. J.A. 501.

Karen Brown received a copy of the complaint on September 23, 2005, and a few hours later answered a call from Neuberger. During that phone call, Karen Brown understood Neuberger to offer NQGRG's representation to the Browns for the Rite Aid litigation without charge. Neuberger, who was also representing Martin Grass, assured Karen Brown that the claims asserted against the Browns "were specious and nothing to worry about." J.A. 692-93. She immediately accepted Neuberger's offer of representation. The Browns maintain that an attorney-client relationship existed with NQGRG, Neuberger, and Quinn for a period encompassing at least the next year.

On March 20, 2006, after the Pennsylvania suit was dismissed for improper venue, Rite Aid filed an identical action in New York. The Browns state they hired separate counsel for their defense in that case, and on June 26, 2006, that local counsel sent them some documents filed by Rite Aid. Franklin

8

Brown claims this is the first time he saw his own forged signature on the "amended" disclosure documents and began to suspect his own entanglement in the fraudulent scheme.

The Browns subsequently hired another attorney, Stephen Nudel, to investigate further. Still, the Browns continued to trust Neuberger and NQGRG. It was only after Nudel informed the Browns of some of his findings--namely the specifics of the shell corporations formed to house and transfer the investment securities--that the Browns "learned for the first time that Isaac Neuberger, Michael Quinn and NQGRG had facilitated the corporate name changes that helped Martin Grass secret his theft of the Investment Securities from Rite Aid." J.A. 1373.

C.

Ultimately, Rite Aid's lawsuit in New York was dismissed as untimely. On June 25, 2009, the Browns filed the instant action in the District of Maryland, asserting fraud and breach of fiduciary duty claims against Appellees. They argue Appellees abused the Browns' attorney-client relationship with NQGRG by failing to disclose their serious conflict of interest, and concealed crucial information about how the Browns had been implicated in the fraudulent scheme.

The district court converted Appellees' motion to dismiss into a motion for summary judgment. The district court found that the Browns were on inquiry notice of their claims at the

9

latest by September 23, 2005, when Karen Brown received a copy of the complaint.[4] The Browns had three years to file their claims, see Md. Code Ann., Cts. & Jud. Proc. § 5-101, unless the statute of limitations was tolled during that period. The court reasoned that equitable tolling was not available to the Browns because they had failed to exercise ordinary diligence in discovering the alleged fraud. Consequently, the court found the Browns' claims were time-barred, and granted the motion for summary judgment. The Browns timely appealed.

## II.

On appeal, the Browns assert their complaint was timely filed because the statute of limitations should be tolled between the date they received Rite Aid's complaint, September 23, 2005, and the date they received Rite Aid's opposition papers in the New York lawsuit, June 26, 2006, under two theories. First, the continuation of events doctrine should toll the statute where a confidential relationship, such as an attorney-client relationship, exists between the parties and operates to prevent the client from discovering facts underlying their claim. Second, the fraudulent concealment doctrine should

---

[4] The Browns do not dispute this finding. Thus, we assume without deciding that the Browns' claims accrued on September 23, 2005.

10

postpone the accrual date of the Browns' cause of action because NQGRG fraudulently concealed facts which are the basis of their claim. We address both of these arguments below.[5] In doing so, we review the district court's grant of summary judgment de novo. Webster v. U.S. Dept. of Agriculture, 685 F.3d 411, 421 (4th Cir. 2012). We also review de novo the district court's interpretation of state law in a diversity case such as this one. Trimed, Inc. v. Sherwood Medical Co., 977 F.2d 885, 888 (4th Cir. 1992).

A.

Maryland recognizes a "continuation of events" theory, whereby the statute of limitations may be tolled while a confidential or fiduciary relationship exists between the parties. MacBride v. Pishvaian, 937 A.2d 233, 239 (Md. 2007). In such situations, "failure to discover the facts constituting fraud may toll the statue of limitations, if: (1) the relationship continues unrepudiated, (2) there is nothing to put the injured party on inquiry, and (3) the injured party cannot be said to have failed to use due diligence in detecting the fraud." Frederick Road Ltd. P'Ship v. Brown & Sturm, 756 A.2d 963, 975 (Md. 2000). The justification for this theory is that

---

[5] Because we conclude neither equitable tolling theory applies, we need not address Appellees' judicial estoppel argument.

11

relationships premised on trust generally give the reliant party the right to depend on the good faith of the other. Id. at 975. Because of the nature of that confidential relationship, the reliant party "is under no duty to make inquiries about the quality or bona fides of the services received, unless and until something occurs to make him or her suspicious." Id. However, blind ignorance of wrongdoing by the fiduciary will not trigger the application of this rule. If the reliant party knows facts "that would lead a reasonable person to undertake an investigation that, with reasonable diligence, would have revealed wrongdoing on the party of the fiduciary," the limitations period is not tolled. MacBride, 937 A.2d at 240 (quoting Dual, Inc. v. Lockheed Martin Corp., 857 A.2d 1095, 1108 (Md. 2004)).

The Browns also seek tolling under the more general theory of fraudulent concealment, recognized by statute in Maryland. "If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud." Md. Code Ann., Cts. & Jud. Proc. § 5-203. Thus, the fraudulent concealment theory may serve to toll the statute of limitations where "(1) the plaintiff has been kept in ignorance of the cause of action by the fraud of the adverse party, and

12

(2) the plaintiff has exercised usual or ordinary diligence for the discovery and protection of his or her rights." Frederick Road, 756 A.2d at 975. As with the continuation of events theory, a party's diligence is crucial in establishing his right to equitable tolling due to fraudulent concealment. This court explained in Go Computer, Inc. v. Microsoft Corp., 508 F.3d 170, 179 (4th Cir. 2007), that

> nothing . . . excuses a negligent plaintiff from the diligence requirement--not even if a fraud is allegedly well-disguised. Fraud by its nature is something perpetrators take pains to disguise, and plaintiffs' notion that allegedly concealed fraud excuses the need for any diligence on the plaintiffs' part would permit statutory periods to be tolled indefinitely, even when plaintiffs could reasonably be expected to bring suit.

In the circumstances presented here, for the reasons discussed below, the Browns' lack of diligence alone is fatal to both of their tolling arguments.[6]

B.

As the district court found, there is no basis for equitable tolling in this case. Even assuming arguendo that an attorney-client relationship existed between the Browns and NQGRG, an abundance of facts in the record indicate the Browns'

---

[6] Because we conclude neither theory applies to NQGRG or its principals, we need not address whether the statute could be tolled under either theory with respect to Martin Grass by way of conspirator liability or the like.

13

suspicions should have been--and indeed were--raised, both as to their underlying claims and as to the trustworthiness of NQGRG.

By their own admission, the Browns suspected Martin Grass embezzled the investment securities in conjunction with the Sera-Tec sale as early as 2001, and in any event no later than 2004, when Karen Brown was asked to resign as trustee. That same year, Franklin Brown was shown a copy of the forged disclosure documents in a proffer session with the government, and was at least alerted to the fact of his suspected involvement by the government's refusal to award assistance credit. Franklin Brown's position as counsel for Rite Aid, officer and director of Sera-Tec, and Alex Grass's personal attorney, alone would seem sufficient to make a reasonable person fear he was implicated in this fraudulent scheme.

And, although the Browns allege they were close personal friends with Neuberger, their knowledge that the firm was also representing Martin Grass and had been intimately involved in the original Sera-Tec conveyance should have alerted them to the obvious conflict of interest with NQGRG. At the very least, a reasonably diligent person in the Browns' position would have investigated immediately. Such an investigation would have revealed that Franklin Brown's signature had been forged as a part of the fraudulent transfer of the investment securities, which is the genesis of their present claims.

14

Thus, even assuming Neuberger and the other Appellees exploited a confidential relationship with the Browns and fraudulently concealed crucial information in an attempt to delay or prevent discovery of their claims, there is simply nothing in the record to excuse the Browns' failure to investigate in the face of a parade of suspicious facts. With reasonable investigation, they would have discovered that their reliance on NQGRG and its principals was misplaced. Because they cannot be said to have used due diligence in detecting fraud in their confidential relationship, to which they had been alerted from the outset, the continuation of events doctrine cannot apply. Likewise, the fraudulent concealment theory does not excuse the need for diligence. The exercise of any diligence by the Browns would have revealed the basis for their asserted causes of action, rendering tolling due to fraudulent concealment similarly inappropriate.

On these facts, we agree with the district court's conclusion that the Browns' failure to exercise diligence, when they had ample reason to suspect fraud, bars their equitable tolling theories. Consequently, their claims, which accrued over three years prior to the date filed, are time-barred.

15

III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.